UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DARLENE KLIPFEL,                              )
                                              )
                Plaintiff,                    )
                                              )
v.                                            )          No.  1:10CV92 TIA
                                              )
                                              )
MICHAEL J. ASTRUE,                            )
COMMISSIONER OF SOCIAL SECURITY,              )
                                              )
                Defendant.                    )

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review

of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social

Security Act and for Supplemental Security Income benefits under Title XVI of the Act.  The parties

consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On August 7, 2007, Plaintiff filed an application for Disability Insurance Benefits ("DIB") (Tr.

125-32)  She filed an application for Supplemental Security Income ("SSI") the following day.  (Tr.

133-37)  Plaintiff alleged disability beginning August 31, 2006 due to shoulder and neck problems,

depression, anxiety, and slow learning.  (Tr. 72, 125, 133)  Plaintiff's applications were denied on

December 6, 2007, after which Plaintiff requested a hearing before an Administrative Law Judge

(ALJ).  (Tr. 70-76, 79)  On September 28, 2009, Plaintiff appeared and testified at a hearing before

an ALJ.  (Tr. 22-61)  In a decision dated November 5, 2009, the ALJ determined that Plaintiff had

not been under a disability from August 31, 2006 through the date of the decision.  (Tr. 9-20) The

Appeals Council denied Plaintiff's Request for Review.  (Tr. 1-3)  Thus, the decision of the ALJ

stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Upon examination by the ALJ, Plaintiff testified that she was 49 years old and lived in a 2-bedroom house in Portageville, Missouri.  She weighed 236 pounds and measured 5 feet 7 inches.  Plaintiff was married and had a 23-year-old daughter.  Plaintiff's husband drove to the hearing, but Plaintiff had a driver's license and drove about 20 miles a week.  Her husband was the owner and operator of a bar and grill called Klipfel's Corner.  Plaintiff did not work there, but she watched the bar when her husband ran errands. (Tr. 25-29)

Plaintiff further testified that she had medical insurance.  She was injured on the job in 2002 and filed a worker's compensation claim in 2004.  Plaintiff eventually settled.  She completed the 10th grade and did not receive her GED, despite a couple of tries.  Plaintiff last worked on September 11, 2006 for Noranda Aluminum.  The company terminated her because she missed a lot of work. Plaintiff testified that she had returned to work after surgery and was placed on the janitorial crew, which was considered light duty.  However, she stated that she had trouble performing the duties of mopping and buffing.  She was frequently absent for health reasons but then missed 4 days of work when her sister went into a coma.  When Plaintiff returned on September 11, 2006, her employer told her she had been terminated.  Since that time, Plaintiff had applied for other jobs that did not require heavy lifting or standing for long periods.  (Tr. 29-32)

Plaintiff worked for Noranda Aluminum for almost 20 years in maintenance and utility.  Her job required her to work with sheet rock, and she performed carpenter, janitorial, concrete, and yard work.  The job also required heavy lifting, including 100 pound bags of concrete mix.  Plaintiff also

worked as a coiler operator, and she drove a crane and a forklift. (Tr. 32-34)

During the day, Plaintiff woke up around 4:00 or 5:00 a.m. She made coffee and did a load of laundry. Her daughter brought the clean clothes upstairs so Plaintiff could fold them and put them away. She only went downstairs to do laundry on good days. Plaintiff was able to do a little bit of cooking, as well as load and unload the dishwasher. Although Plaintiff was able to change the sheets, she could not vacuum due to back problems. In addition, Plaintiff could only perform a little mopping and no sweeping. Plaintiff occasionally shopped but testified that her daughter did most of the shopping. Grocery store employees carried her groceries for her. Plaintiff could carry light grocery bags into the house, but her daughter carried the heavy ones. (Tr. 32-35)

Plaintiff further testified that she spent the day sitting around with a heating pad on her back or watching movies on TV. She also enjoyed scrapbooking and reading magazines, as well as playing games on her computer. In addition, Plaintiff stated that she had a few friends, and she got along okay with her family and neighbors. She did very little during the evening. Occasionally, Plaintiff went to the bar and sat with her husband when the bar was not crowded. She did not like to be around a lot of people. Plaintiff testified that she visited her sister, who lived 10 minutes away. In addition, she attended church. Although she enjoyed yard work, she was no longer able to do so. Plaintiff could mow the lawn using the riding lawn mower and re-pot plants. She previously had a large vegetable garden, but now could only handle a small garden with 2 tomato plants. Plaintiff also drove her dog to the park and sat on a bench while the dog ran around. Plaintiff did not participate in any other outdoor activities. She could only stand long enough for a quick shower; however, the jets in the tub helped her back when she took a bath. She got into and out of the tub slowly. (Tr. 35-39)

Plaintiff further testified that she smoked a half pack or less of cigarettes daily. She did not drink even though she tended bar. In addition, Plaintiff did not use illegal drugs. Plaintiff took Zoloft for depression. Plaintiff also took Naproxin to reduce the inflammation in her back and shoulder. Further, Plaintiff stated that she took Lorazipam to help her relax and sleep at night. However, the medication caused her to be groggy for half of the next day. Plaintiff's other medications included Prednisone, Prilosec, Alleve, aspirin, and Vicodin. The Vicodin did help alleviate pain. Plaintiff testified to side effects from the medication which included upset stomach, dizziness, and light headedness. (Tr. 39-42)

Plaintiff stated that she experienced pain in her neck, shoulders, and back. Her normal level of pain was an 8 or 9 on a scale from 1 to 10. Taking Vicodin reduced the pain to a level 6. In addition, Plaintiff testified to pain in her left arm, which she described as a throbbing, toothache pain. She was unable to put her left arm over her head, but she had no problems with her right arm. Plaintiff also had problems with depression and anxiety. She explained that she worked all her life, but became depressed when she was fired. She cried a couple times a week. She did not have anxiety attacks because she stayed around the house. Plaintiff testified that the Lorazipam helped with anxiety but that she experienced a couple of panic attacks during which she couldn't breathe and felt as though the wall was closing in on her. She stated that she did not like crowds and preferred small groups of people. Although she did not have any problems with her supervisors, she did have trouble getting along with other employees. Plaintiff did not come in contact with the public when tending bar, as she usually helped at the bar during the day when there were no patrons. Plaintiff merely opened the door for deliveries. She had never been hospitalized for mental problems, and she was not under the care of a psychologist or psychiatrist. Plaintiff's primary care physician prescribed

her medications.  (Tr. 42-45)

With regard to her depression and anxiety, Plaintiff testified that she felt suicidal once or twice but never attempted to end her life.  She had poor concentration and had to read a book or magazine 2 or 3 times to understand it.  Plaintiff could sit better than she could stand, although sitting bothered her also.  She believed she could stand for 10 or less minutes; walk maybe a block; and lift 5 or less pounds.  She was able to pour herself a glass of milk.  In addition, Plaintiff had problems bending, stooping, crouching, kneeling, and crawling because it hurt her back, shoulder, and neck.  However, she testified that she could bend to sit down or get in bed even though it was uncomfortable.  She could climb only a few steps.  (Tr. 45-47)

Plaintiff's attorney also questioned the Plaintiff regarding her alleged impairments.  Plaintiff stated that Drs. Kelly and Dennis Reed diagnosed fibromyalgia, primarily in her left upper extremity. Her symptoms included aches and pains all over her body.  Plaintiff had not seen a specialist in fibromyalgia treatment because she did not have insurance.  Dr. Dennis Reed was Plaintiff's primary care physician, and his treatment notes reflected diagnoses of sciatica, fasciatus, osteoarthritis, and radiculopathy.  Dr. Reed recommended that Plaintiff see a neurologist to assess a bulging disc at L-4 and L-5, but she did not have the money to pay for an appointment.  Plaintiff further testified that she experienced headaches due to tension and stress.  The headaches, which she described as sharp pain, occurred every day, and the pain level was 7 or 8.  Plaintiff also experienced nausea with the headaches.  Plaintiff usually laid in bed.  She did take too much medication because she did not want to become addicted to pain medication.  (Tr. 47-50)

Further, Plaintiff experienced constant, aching pain in her left leg over the past year.  The pain became worse with activity such as bending down to work in her flowers.  She reported this to Dr.

Reed, but her financial status prevented her from seeing a neurologist. With regard to her neck pain, Plaintiff stated that it hurt if she was up a lot. Laying down eased the pain. Plaintiff spent about 4 to 5 hours total lying down during the day. Plaintiff also testified that she was diagnosed with thoracic outlet syndrome in 2005, which caused muscles and nerves to get tangled around her rib. The doctors removed the rib, cutting a few nerves as well. Plaintiff stated that she was still without feeling in parts of her left chest. In addition, Plaintiff testified that her thoracic outlet syndrome contributed to her neck pain. (Tr. 50-53)

Further, Plaintiff explained that her inability to lift her left arm over her head caused her to have difficulty washing her hair with her left hand. She modified the way she dresses by wearing button down shirts instead of shirts she would have to pull overhead. Plaintiff stated that she could not return to work at Noranda due to the problems with her back, legs, neck, and shoulder. While she would love to return to work, she can no longer perform her past duties. Further, Plaintiff testified that she was absent 1 or 2 days per week because she would go to work, overexert herself, then be unable to work the next 2 days due to pain. Although her easiest job at Noranda was as a coiler operator, Plaintiff stated that she could not go back to that position, as it required twisting, bending, and lifting. (Tr. 53-55)

The ALJ noted a previous function report from 2007 in which Plaintiff stated she made her bed, did laundry, prepared meals, cleaned her husband's business, took orders, mowed the grass, used a weed eater, and cleaned the dog kennel. Specifically, Plaintiff reported that she did laundry two hours a day; cleaned the house two hours a day; mowed the lawn eight hours a week; drove; shopped; read; watched TV; played video games; went to the post office and bank; and walked two or three blocks. Plaintiff testified that she was no longer able to perform many of these activities. (Tr. 55-56;

163-72)

A Vocational Expert ("VE"), Ms. Young, also testified. Ms. Young testified that Plaintiff's past work doing building maintenance likely fit the definition of heavy and unskilled work, although Ms. Young opined that the work as Plaintiff performed it was at the semi-skilled level. With regard to Plaintiff's past work as an interior painter, the job as usually performed was classified as medium skilled work. However, Plaintiff's description was as heavy and at the lower end of the semi-skilled range. Plaintiff's position as a coiler operator was classified as medium and unskilled, but because she operated other machines, the job as Plaintiff performed it was heavy and semi-skilled. (Tr. 57-58)

The ALJ then asked the VE to assume a person the age of 49 with a limited education and past relevant work identified by the VE. In addition, the individual could perform the exertional demands of sedentary work as defined in the Social Security regulations. This person could lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently; sit, stand, and walk each six out of eight hours, with a total of eight out of eight hours; climb, balance, stoop, crouch, kneel, or crawl occasionally; reach overhead with the left upper extremity occasionally; climb ladders, ropes, or scaffolds never; and perform only simple, repetitive tasks. Based on this hypothetical, the VE testified that the individual could not perform Plaintiff's past relevant work. However, the person could perform other work such as sedentary and light small product assembly, cashier, and telemarketer. (Tr. 58-59)

Plaintiff's attorney also questioned the VE. In response to the question whether the aforementioned jobs would be impossible for a person to perform if he or she had to lie down for 4 hours a day, the VE answered, "yes . . ." With regard to using strong pain medication which rendered the individual drowsy throughout the day, the VE stated that drowsiness would not preclude a

person from performing these jobs. The VE also clarified that the cashier job allowed alternating sitting and standing at will; the assembly jobs allowed for intermittent standing at a work station; and the telemarketing job required being in a seated position except for breaks and lunch. (Tr. 59-60)

### III. Medical Evidence

In June 2002, Plaintiff was injured at work and was restricted to lifting no more than 10 pounds. In September 2002, a CT of her cervical spine revealed C5-6 posterior disc osteophyte complex which was eccentric to the left paracentral region and contacted the left hemi-cord. A myelogram showed minor ventral extradural defects at C4-5 and C5-6 without significant central spinal canal stenosis. On September 12, 2002, doctors released Plaintiff to work with restrictions for 2 weeks which included lifting 5 pounds; no walking or standing; occasional bending, squatting, twisting, climbing, pushing, pulling, and reaching over head; and sitting only. (Tr. 200-06, 211, 218)

Plaintiff first presented to Dr. Robert W. Thompson on November 4, 2004, for an evaluation for possible thoracic outlet syndrome.[1] Plaintiff complained of symptoms for over 3 years which affected her left arm and resulted in the onset of a strain to the left shoulder and neck. Plaintiff reported pain and heaviness in her shoulder and neck area on the left side and back of the neck, as well as headaches. In addition, she stated that the symptoms had progressed such that she experienced numbness and tingling that affected her arms, forearms, hands, and fingers. Dr. Thompson opined that Plaintiff may have mild to moderate neurogenic TOS. However, he did not believe this explained all of her symptoms. Dr. Thompson recommended conservative management of her TOS, which included targeted physical therapy by an individual with expertise in TOS, to help

---

[1]  Thoracic Outlet Syndrome, or TOS, is defined as a "collective title for a number of conditions attributed to compromise of blood vessels or nerve fibers . . . at any point between the base of the neck and the axilla." Stedman's Medical Dictionary 1916 (28th ed. 2006).

improve her overall condition. A follow up visit on December 16, 2004 revealed only a tiny bit of improvement in her upper extremity symptoms as a result of physical therapy. Dr. Thompson ordered another course of physical therapy and an MRI to rule out MS. (Tr. 445-450)

Plaintiff followed up with Dr. Thompson on January 13, 2005. She reported minimal improvement with physical therapy. Dr. Thompson noted that the MRI revealed no evidence of MS and that some of her lower extremity symptoms mimicked sciatica. He believed Plaintiff was a good candidate for surgery if she did not make satisfactory progress with physical therapy. Plaintiff later reported worsening symptoms and asked to schedule surgery as soon as feasible. (Tr. 441-42)

Plaintiff underwent left supraclavicular thoracic outlet decompression including radical anterior and middle scalenectomy, brachial plexus neurolysis, and resection of the first rib on February 2, 2005.[2] Plaintiff tolerated the procedure well. During her follow up visit on March 3, 2005, Dr. Thompson noted that Plaintiff was doing well with no complications. (Tr. 438, 458-60)

On May 19, 2005, Plaintiff returned to Dr. Thompson. Plaintiff had little muscle spasm on palpation in the neck, and she had good range of motion of the left arm with fairly good use of the arm. Dr. Thompson noted that Plaintiff was doing extremely well and wanted to return to work. He recommended that she return to work with light duty restrictions and that she continue physical therapy. By September 22, 2005, Plaintiff was increasing her level of activity and showed steady improvement. She had not seen the therapist affiliated with Dr. Thompson's office for some time, and he recommended that Plaintiff make an appointment to receive good therapy recommendations. Dr. Thompson released her to return to work without the use of her left arm overhead or lifting more

---

[2] Follow-up forms indicate that the surgery took place on February 21, 2005. (Tr. 438, 440)

than 20 pounds or any heaving carrying. (Tr. 425, 427)

When Plaintiff returned to Dr. Thompson on January 5, 2006, he noted that Plaintiff was doing extremely well and had returned to a high degree of function. However, some activities requiring the use of her arm aggravated her symptoms. Dr. Thompson recommended more rigorous control of her work environment with restrictions of no use of the arms overhead, no lifting over 20 pounds, and no repetitive use of the left upper extremity. He also recommended a supervisory position. (Tr. 421)

On March 7, 2006, Plaintiff reported periodic flares of her symptoms of pain, numbness, and tingling during times when her job required her to exceed restrictions. Dr. Thompson opined that Plaintiff was stable but needed significant permanent restrictions on activity at work to prevent relapse or worsening of symptoms. He encouraged her to discuss the issues with her employer. Dr. Thompson noted that Plaintiff continued to make steady recovery from the TOS surgery during a follow up visit on June 15, 2006. Plaintiff was doing well at work under the previous restrictions. He advised that the restrictions should remain in place such that she can continue working in an environment that protects her from exacerbating factors. Dr. Thompson recommended that Plaitniff continue working with restrictions during an October 19, 2006 visit. He also ordered a new CT scan to follow up on the status of her C-spine. (Tr. 407, 413, 419)

Plaintiff underwent a CT scan in November, which resulted in a normal result. During a March 1, 2007 follow up visit with Dr. Thompson, Plaintiff reported that she had been terminated from employment because she was unable to return to her previous duties. Dr. Thompson advised Plaintiff to return in one year. (Tr. 394) Raymond F. Cohen, D.O., provided a medical rating statement on June 14, 2007. In that statement, he assessed Plaintiff's prior medical examination

records and test results. His diagnoses pertaining to Plaintiff's work-related injuries on June 2, 2002 and September 10, 2003 were left neurogenic thoracic outlet syndrome and status post left supraclavicular thoracic outlet decompression, respectively. Dr. Cohen recommended that Plaintiff continue on the permanent work restrictions given by Dr. Thompson and to continue analgesic medications. Further, he opined that Plaintiff was permanently and totally disabled from her prior occupation or a similar occupation but that she could be employed in a sedentary or light labor occupation. (Tr. 859-65)

When Plaintiff returned to Dr. Thompson on August 9, 2007, she reported pain in the middle of the cervical neck over the C6-C7 areas of the cervical spine which radiated into the trapezius and rhomboid muscles. Dr. Thompson opined that the symptoms were not attributable to TOS and recommended another C-spine CT scan. Handwritten notes indicated that the film showed minimal degenerative disc disease and osteoarthritis at C5-C6 with minimal neuroforaminal narrowing, and the CT scan showed minimal spurring at C5-C6. (Tr. 380) Plaintiff presented for follow up visit on May 28, 2008. Dr. Thompson noted steady progress and improvement. Plaintiff reported increased use of the left arm with decreasing symptoms. She was looking for a job but had been unable to find one. Examination revealed full range of motion of both upper extremities. She reported some general symptoms, and Dr. Thompson recommended occasional use of pain and sleep medications. (Tr. 584)

Plaintiff was also treated for shoulder, neck, and back pain beginning in 2002. She saw Dr. Patrick Knight August, 2002 through November, 2002 for complaints of pain in her shoulder, neck, and left arm. (Tr. 740-53) Plaintiff underwent a CT scan of her cervical spine in September 2002. The test was unremarkable other than at the C5-6 level, there was eccentric posterior disc osteophyte

complex to the left which contacted the left hemi-cord and minimally flattened the left hemi-cord. There was no evidence of a focal disc herniation, central spinal canal stenosis, or neural foraminal narrowing. Further, a cervical myelogram revealed minor ventral extradural defects at the C4-5 and C5-6 levels without significant central spinal canal stenosis. (Tr. 772, 774) Dr. Patrick Knight noted on November 18, 2002 that Plaintiff's pain in her neck and shoulders was non-surgical. He also stated that Plaintiff had not been approved for physical therapy and that there was no need for any further orthopaedic intervention at that time. (Tr. 753)

On January 7, 2003, Plaintiff complained of pain in her neck, head, low back, and left knee. She was taking Zoloft and Vioxx. Dr. A.B. Chaudhari assessed significant cervical and lumbar spondylosis with interfacetal arthrosis; SI joint arthrosis; bilateral piriformis syndrome; bilateral greater occipital neuralgia; migrainous or tension headaches; costochondritis; chronic pain syndrome; and fibromyalgia.. Dr. Chaundhari prescribed pain medication and advised Plaintiff to return in 1 month. (Tr. 754-56)

Dennis Reed, P.A., evaluated Plaintiff on December 1, 2003 for complaints of sore throat and congestion, as well as a follow up for MRI results. Mr. Reed noted that Plaintiff denied neck pain, myalgia, arthralgia, anxiety, and depression. She did report headaches. The objective medical examination was normal aside from a sore throat. He assessed a respiratory tract infection and recommended over the counter pain and cold medication. On January 26, 2004, Plaintiff complained of a painful left shoulder. Mr. Reed opined that Plaintiff could have suffered a rotator cuff injury. Plaintiff complained of pain in her neck, shoulder, arm, forearm, hand, and left leg on August 10, 2004. She also reported headaches. Mr. Reed recommended a CT scan of Plaintiff's head due to her headache and neck/arm pain. (Tr. 776-77, 780, 786)

Dr. Edmund C. Landry, Jr., evaluated Plaintiff at the request of Dennis Reed, P.A. on February 3, 2004. Plaintiff reported re-injuring her shoulder, resulting in a "fiery pain" in her left shoulder area. She also complained of neck pain that radiated into the interscapular area of the back and the left trapezius. Plaintiff was still working. Dr. Landry noted that Plaintiff's previous imaging tests were normal. Plaintiff appeared to be in no acute distress, and her mood and affect were normal. She had full range of motion in her neck, with no tenderness, spasm, or masses. Plaintiff had tenderness in the trapezius muscles more on the left. She displayed full range of motion of all joints and had good muscle strength and tone. Dr. Landry opined that Plaintiff's pain in the left trapezius was due to muscle strain. He recommended physical therapy. (Tr. 787-89)

Plaintiff saw a chiropractor, Jeffrey C. Harrison, DC, in February 2004. Plaintiff complained of constant neck pain and stiffness radiating into the left shoulder to the left arm, along with daily headaches. Her range of motion in the cervical spine was moderately restricted in all directions. Dr. Harrison diagnosed cervical radiculitis complicated by associated osteoarthritis. He recommended treatments consisting of interferential electronic muscle stimulation of the cervical and thoracic paravertebral musculature and chiropractic manipulative therapy. (Tr. 799-800)

A letter dated August 18, 2004 to Dennis Reed, P.A., from Joel West Ray, M.D. indicated that Plaintiff complained of worsening headaches; neck pain; left upper extremity pain and numbness; left lower extremity pain, tingling and numbness radiating down the back left leg; and stress, depression, and anxiety. She had no complaints of low back pain. Dr. Ray noted that the MRI of Plaintiff's cervical spine in 2003 showed nothing significant. He ordered a new MRI and referred her to Dr. Lee. (Tr. 833-35)

A September 7, 2004 letter to Dr. Joel Ray from a consulting neurologist, Dr. David Lee,

indicated that Plaintiff suffered two work-related injuries. Examination revealed pain over the posterior neck and lumbar areas, mild facial asymmetry, negative straight leg raising test, good power in all four limbs, symmetrical deep tendon reflexes, flexor plantar responses, and a positive Allen's test[3] on the left side. Dr. Lee opined that Plaintiff's neck and left arm pain, as well as the lower back and left leg pain, were musculoskeletal in origin. Dr. Lee ordered home traction equipment for Plaintiff to use at home twice daily if tolerated. He also advised her to switch to a more sedentary job. (Tr. 485-88)

An MRI of the cervical spine on September 7, 2004 revealed minimal analar bulges at C4-5 and C5-6 with the left parac disk protrusion at C5-6 minimally narrowing the left neural foramen. (Tr. 855) An MRI of the lumbar spine performed on September 30, 2004 demonstrated mild circumferential disk bulge at L4-5 which combined with mild facet and ligamentous hypertrophy to result in mild narrowing of the inferior portions of the bilateral neural foramina. However, it did not appear to encroach upon the exiting nerve roots. The remainder of Plaintiff's lumbar spine was within normal limits. (Tr. 489)

Plaintiff underwent a CT scan of her lumbar spine on January 13, 2005. The test revealed normal alignment without spondylolisthesis or fractures. Limited evaluation of the discs indicated

---

[3] Allen test is a test for radial or ulnar patency; either the radial or ulnar artery is digitally compressed by the examiner after blood has been forced out of the hand by clenching it into a fist; failure of the blood to diffuse into the hand when opened indicates that the noncompressed artery is occluded. Stedman's Medical Dictionary 1949 (28th ed. 2006).

mild posterior disc bulge at L2-3 and L3-4 without canal stenosis. In addition, the radiologist noted mild facet ostioarthropathy at L5-S1 without neural foraminal narrowing. (Tr. 470)

On January 3, 2008, Dr. Thomas W. Marsh performed an independent medical evaluation. Dr. Marsh noted that Plaintiff's symptoms expanded well beyond her ongoing initial symptoms of the left shoulder, arm, and neck pain. After a full examination, Dr. Marsh assessed chronic neck pain and chronic cervical spondylosis, which was preexisting. He also noted chronic recurring headaches of unclear origin. Additionally, Dr. Marsh assessed "disputed" neurogenic thoracic outlet syndrome, noting incomplete records. Other impressions included chronic fatigue; chronic moderate/severe tendinopathy, left shoulder, cause unkown; chronic low back pain; recurrent vesicular left greater than right extensor forearm eruptions; decreased vibratory sense, lower and upper extremities; numbness and tingling of lower extremities; substernal chest pain; multiple joint stiffness; bladder incontinence; bilateral calf pain; increased sweating in the face, torso, and chest; 40 pound weight gain; and chronic constipation. Dr. Marsh noted Plaintiff's return to full duty work in 2002 and 2003 despite neck/shoulder symptomatology. Dr. Marsh concluded, however, that the limited records available did not allow for a definitive opinion regarding causality. (Tr. 868-88)

In addition to treatment for her physical impairments, Plaintiff received mental health care. Plaintiff reported taking Zoloft for 7 years during her examination with Dr. Ray. (Tr. 835) Plaintiff also attended a psychological evaluation with Thomas J. Spencer, Psy.D., on November 28, 2007. Her chief complaint was that she had no money. Plaintiff described pain and discomfort in her head, shoulder, and low back, as well as limited range of motion. She also reported that she saw a psychiatrist secondary to stress. She described being easily upset, panicky, and nervous, with some irritability and aggitation. Although she had daily feelings of hopelessness, helplessness, and

worthlessness, she denied thoughts of suicide. While her mood was often depressed, she denied being depressed more often than not. Plaintiff also experienced insomnia. With regard to daily functioning, Plaintiff reported getting up each day and trying to keep her house clean. She also would stop by and keep an eye on the restaurant. She enjoyed scrap booking, playing computer games, and watching movies. (Tr. 496-98)

During the mental status exam, Plaintiff was cooperative and did not appear to be in a great deal of physical distress despite a delay in motor behavior. Her insight and judgment were intact. She appeared to be of low average intelligence. Dr. Spencer assessed major depressive disorder, recurrent, mild to moderate; generalized anxiety disorder; occupational, economic, and access to health care problems; and a GAF of 55-60.[4] Dr. Spencer concluded that Plaintiff was capable of understanding and remembering moderately complex to complex instructions. She was also capable of engaging in and persisting with simple to moderately complex tasks, although her health issues could impair those abilities. Plaintiff displayed minimal impairment with regard to her ability to interact socially and adapt to the environment. Further, she appeared capable of managing her benefits without assistance. (Tr. 498-99)

Dr. James Spence, Ph.D., completed a Psychiatric Review Technique form on December 6, 2007. He assessed affective disorders, finding major depressive disorder, recurrent, mild to moderate. In addition, he noted a generalized anxiety related disorder. Dr. Spence found mild restrictions of activities of daily living and mild difficulties in maintaining social functioning. He assessed a moderate degree of limitation regarding difficulties in maintaining concentration, persistence, or pace. He noted

---

[4] A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

no repeated episodes of decomposition. Dr. Spence also completed a Mental Residual Functional Capacity Assessment, finding only moderate limitations to Plaintiff's ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; and ability to accept instructions and respond appropriately to criticism from supervisors. Plaintiff had no other limitations, and Dr. Spence concluded that the evidence in the file supported the finding that Plaintiff was capable of at least simple, repetitive tasks on a sustained basis in a low stress environment. (Tr. 496-515)

## IV. The ALJ's Determination

In a decision dated November 5, 2009, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. She had not engaged in substantial gainful activity since August 31, 2006, the alleged onset date. The ALJ found the following severe impairments: thoracic outlet syndrome; discogenic and degenerative disorders of the back; fibromyalgia; disorders of muscle, ligaments, and fascia; affective mood and anxiety disorders; and obesity. However, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11-12)

In addition, the ALJ determined that Plaintiff could stand/walk 2 hours out of 8 and sit 6 hours out of 8 during an 8-hour workday. She had the residual functional capacity ("RFC") to perform sedentary work with the following limitations: occasional climbing of ramps and stairs; occasional balancing, stooping, crouching, and crawling; never climbing ladders, ropes, or scaffolds; occasional use of the left upper extremity for reaching; and only simple, repetitive tasks and instructions. The ALJ relied upon Plaintiff's subjective complaints and the medical records to reach

this RFC determination. The ALJ found that Plaintiff's complaints were inconsistent with the results of diagnostic testing and imaging and the clinical findings from examination, as well as conservative treatment and lack of prescribed strong narcotic pain medication. Further, Plaintiff's restricted daily activities were a matter of choice and not medical proscription. In addition, she reported performing several household tasks. (Tr. 12-18)

The ALJ further found that Plaintiff was unable to perform her past relevant work. In light of her age of 46 years old at the time of her alleged onset date, her limited education, and her past work experience, the ALJ determined that a significant number of jobs existed in the national economy which Plaintiff could perform. The ALJ considered the Medical-Vocational Guidelines ("Grids") and then relied upon the testimony of the VE due to Plaintiff's additional limitations. The ALJ rejected the hypothetical posed by the Plaintiff's attorney, as the evidence did not support the hypothetical factors. In light of the VE's testimony that several sedentary occupations as listed in the Dictionary of Occupational Titles existed in significant numbers, the ALJ found that the Plaintiff was not disabled. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from August 31, 2006 through the date of the decision. (Tr. 18-20)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step

evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523,

527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[5] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI.  Discussion

Plaintiff raises three arguments in her Brief in Support of the Complaint.   First, she asserts that substantial evidence does not support the ALJ's determination because the hypothetical question posed to the VE did not contain all of Plaintiff's limitations.  In addition, Plaintiff contends that the ALJ erred in failing to fully develop the record by ordering a neurological consultative examination.

---

[5]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Finally, Plaintiff argues that, because the ALJ found Plaintiff could only perform sedentary work, the Grids required a finding of disabled when she turned 50 years old, given her limited education and lack of transferable skills. The Defendant responds that the ALJ correctly found that Plaintiff was not fully credible with regard to her alleged limitations and that the ALJ properly included only those limitations supported by the record in the hypothetical question. Defendant also asserts that the ALJ had no obligation to order a consultative examination with a neurologist, as the medical evidence contained in the record was sufficient. Last, Defendant maintains that the Plaintiff was not 50 years old at the time of the ALJ's decision, and the ALJ correctly classified her as a younger person.

## A. Hypothetical to the VE

First, Plaintiff argues that the hypothetical question posed by the ALJ to the VE failed to include all of Plaintiff's limitations, specifically the need to lie down during the day, and, therefore, the VE's response did not constitute substantial evidence. The Defendant responds that hypothetical question properly included only those impairments and restrictions that the ALJ found credible and that no treating physician indicated a necessity to lie down.

The undersigned agrees that the ALJ posed a proper hypothetical question to the VE and that the VE's testimony that Plaintiff could perform work was substantial evidence in support of the ALJ's determination. "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Further, where substantial evidence supports an ALJ's finding that a plaintiff's complaints were not credible, the ALJ may properly exclude those complaints from the hypothetical question. Id.

In the instant case, the ALJ included only those impairments and limitations that he found

credible. In assessing Plaintiff's credibility, the ALJ noted that the medical evidence did not support Plaintiff's allegations. See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (stating that the ALJ my consider the lack of objective medical evidence in determining disability). No treating physician found or imposed long term, significant physical limitations on Plaintiff's functional capacity. Indeed, Dr. Thompson noted steady improvement, advised continued physical therapy, and released her to work in a sedentary capacity. (Tr. 407, 413, 419, 421, 425, 427, 584) Dr. Cohen agreed that Plaintiff could be employed in a sedentary or light labor occupation. (Tr. 865) Furthermore, diagnostic tests were inconsistent with Plaintiff's complaints. As noted by the ALJ, the minimal results of diagnostic testing and imaging, along with the conservative courses of treatment did not support Plaintiff's claims of disability. Plaintiff did not possess the symptoms usually associated with chronic, severe musculoskeletal pain, and the medical evidence did not reflect an inability to ambulate or perform find and gross motor skills effectively. (Tr. 16) The record is also void of any medical evidence requiring Plaintiff to lie down during the day. This contradicts Plaintiff's allegations that she is unable to work. Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005).

Further, Plaintiff's daily activities are inconsistent with her allegations of disability, including a need to lie down throughout the day. As noted by the ALJ, Plaintiff's alleged restrictions were by choice and not by medical proscription. (Tr. 17) Indeed, one year after her alleged onset date, Plaintiff reported making beds, fixing simple meals, doing laundry, performing light house and yard work, driving, watching movies, and helping her husband with his restaurant/bar business. (Tr. 17, 163-72) These activities are inconsistent with Plaintiff's allegations of disabling pain. Gwanthey v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (holding that Plaintiff's ability to perform housework among other activities precluded a finding of disability). Based upon the aforementioned

inconsistencies, the undersigned finds that the ALJ properly assessed Plaintiff's credibility and found that Plaintiff's impairments were not as severe as she alleged. See Hamilton v. Astrue, 518 F.3d 607, 613 (8th Cir. 2008) (affirming the ALJ's credibility analysis where medical records did not support the plaintiff's disability claim, and the plaintiff's testimony was not credible).

Because the record as a whole did not support Plaintiff's allegation that she needed to lie down during the day, the ALJ properly excluded that limitation from his hypothetical. The ALJ asked the VE to assume a 49 year-old individual with Plaintiff's limited education and past work experience, who could work at a sedentary exertional level. (Tr. 58) The ALJ also included those credible physical and mental limitations, such as lifting, carrying, pushing, and pulling 10 pounds occasionally and less than 10 pounds frequently; sitting, standing, and walking each six out of eight hours, with a total of eight out of eight hours; climbing, balancing, stooping, crouching, kneeling, or crawling occasionally; reaching overhead with the left upper extremity occasionally; climbing ladders, ropes, or scaffolds never; and performing only simple, repetitive tasks. (Tr. 58-59) These limitations are consistent with medical and other evidence in the record.

Plaintiff's attorney raised the additional limitation of lying down 4 hours a day. However, as stated above, the evidence does not support this limitation, and the ALJ properly discredited Plaintiff's allegations. As such the ALJ was not required to include the limitation in his hypothetical question to the VE. Therefore, the undersigned finds that "[t]he hypothetical was sufficient because it represented a valid assessment of [Plaintiff's] . . . limitations consistent with the evidence in the record." Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001). Because the hypothetical question properly set forth Plaintiff's limitations, the VE's testimony constituted substantial evidence upon which the ALJ could properly rely in determining that Plaintiff was not disabled. Id.

## B. Consultative Examination

Next, the Plaintiff argues that the ALJ erred by failing to order a consultative examination by a neurologist. Defendant, on the other hand, contends that the record contains a neurologist's examination and opinion and that Plaintiff has not demonstrated that the evidence is insufficient for the ALJ to make a determination.

The undersigned agrees with the Defendant. An ALJ is required to order a consultative examination "only if the available evidence does not provide an adequate basis for determining the merits of a disability claim." Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). Here, the 1145 page transcript was replete with diagnostic test results, along with medical records and opinions from several doctors, including neurologists. The record was more than sufficient for the ALJ to make a determination. Plaintiff has not demonstrated that the record was somehow incomplete, and the undersigned finds that the ALJ did not err in failing to order a consultative examination by a neurologist.

## C. Plaintiff's Age

Last, Plaintiff argues that the ALJ erred in not finding her disabled as of the time she turned 50 years old as required by the guidelines. Specifically, the Plaintiff contends that the guidelines would have directed a finding of disability in light of her closely advanced age under 20 C.F.R. § 404.1563(d), lack of transferrable skills, and limited education. Defendant asserts, however, that at the time of the ALJ's decision, Plaintiff was less than 49 ½ years old and was properly classified as a younger person. The undersigned finds that the ALJ did not err in classifying Plaintiff as a younger person.

The ALJ rendered his decision on November 5, 2009. Plaintiff's birthday was June 16, 2010,

over 7 months later. The regulations state, "[i]f you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case." 20 C.F.R. § 404.1563(b). While this provision does not define "a few months," prior courts have held that 7 months does not fall within a borderline situation warranting classification in the next age category. Lambert v. Chater, 96 F.3d 469, 470 (10th Cir. 1996); see also Russell v. Bowen, 856 F.2d 81, 84 (9th Cir. 1988) (noting that lines must be drawn to efficiently utilize the Grid system). As such, the ALJ properly determined that Plaintiff was a younger person, and substantial evidence supports the ALJ's determination that Plaintiff was not disabled from August 31, 2006 through the date of the decision.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

                                          /s/ Terry I. Adelman
                               UNITED STATES MAGISTRATE JUDGE

Dated this  9th  day of September, 2011.